**Elden Clay MAYNARD,**
**Plaintiff–Appellee,**

v.

**CITY OF SAN JOSE; Les White; James Daniels; Jack Atkinson; and Nancy Jackson, Defendants–Appellants.**

**Elden Clay MAYNARD,**
**Plaintiff–Appellant,**

v.

**CITY OF SAN JOSE; Les White; James Daniels; Jack Atkinson; and Nancy Jackson, Defendants–Appellees.**

Nos. 93–16529, 93–16622.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Sept. 14, 1994.

Decided Oct. 13, 1994.

As Amended Nov. 22, 1994.

Andrea Bryan Lynn and Michael Ross Groves, Sr. Deputy City Attys., San Jose, CA, for defendants-appellants.

Robert E. Jesinger and Tania B. Rose, Wylie, McBride, Jesinger, Sure & Platten, San Jose, CA, for plaintiff-appellee.

Before: FARRIS, BEEZER, Circuit Judges, and McLAUGHLIN, District Judge.*

FARRIS, Circuit Judge:

The City of San Jose and the individual defendants appeal the jury's partial verdicts for Elden Clay Maynard on his federal civil rights and pendent state claims. Maynard cross-appeals the district court's denial of equitable relief and its calculation of attorneys' fees. We affirm in part, reverse in part, and remand for further consideration of the damages award.

## I. Background

In July of 1986 Elden Clay Maynard began working for the City of San Jose as a communications engineering manager in the General Services Department. The Department assigned Maynard to work on its development of a new 911 Public Safety Communications Center. Maynard's responsibilities included supervising several employees in the Department's engineering section and working with a police officer assigned to help ensure that the new communications center met the Police Department's needs.

Later that year, Maynard learned that his supervisor, Jack Atkinson, had selected someone to train police and fire dispatchers to use the new system before Nancy Jackson, another manager in the Department, had finished interviewing all candidates for the position. Maynard discovered that Atkinson had drafted a letter offering the job to Irene Carroll, who is white, on December 9, 1986, but dated the letter December 11, 1986, the day that Carroll's interview was scheduled.

Paul Ewing, the police officer working with Maynard, learned that Carroll had been hired. He asked Maynard about this, and Maynard told him that Atkinson had prepared in advance the letter offering her the job. Ewing, in turn, told a captain in the Police Department about the letter. The captain was married to Beverly Adkins, a Black woman who had applied for the job. Adkins filed a complaint alleging irregularities in the hiring process.

In response to Adkins's complaint, James Daniels, the Director of General Services, convened a panel—on which he served—to investigate the allegations. The panel interviewed Maynard, who told them about Atkinson's letter. The panel recommended that the City withdraw its offer to Carroll and start the hiring process over again. An independent, three-person hiring committee eventually reinterviewed all the candidates

---

\* Honorable Linda Hodge McLaughlin, United States District Judge for the Central District of Northern California, sitting by designation.

and recommended Carroll for the job, and she was hired a second time.

A few weeks after Maynard had testified before the panel, Daniels formally reprimanded Maynard for disclosing the irregularities in the hiring process outside the "chain of command." Over the next few years, Maynard's relationships with other employees in the Department continued to deteriorate. During this time, Maynard reported alleged irregularities in the purchase of communications equipment. Maynard contends that Daniels, Atkinson, and Jackson conducted an ongoing campaign of retaliation because he had assisted Adkins and complained about procurement practices.

Maynard claims, among other things, that (1) Daniels, Jackson, and Atkinson excluded Maynard from workshops and meetings, harassed him, and gradually decreased his responsibilities; (2) Jackson spread false rumors that Maynard was violent, filed a groundless sexual harassment complaint against him, and insisted that he be fired; (3) the Department filed negative performance evaluations, stripped him of almost all his duties, moved his office, without notice, to another building; (4) Les White, the assistant city manager, transferred Maynard to the Airport Department where he was assigned a much less desirable job; and (5) during the trial, the City laid him off.

The City contends that its employees never attempted to retaliate against Maynard but acted only to ameliorate the deteriorating work environment and to respond to the sexual harassment complaint. At one point the City hired an industrial psychologist in an attempt to reintegrate the Department's staff. The City argues that it transferred Maynard to the Airport Department in response to his attorney's request and the psychologist's recommendations. The City fur-

ther contends that Maynard's termination resulted from city-wide budget cuts.

On November 17, 1989, Maynard filed a complaint in district court against the City, White, Daniels, Atkinson, and Jackson. He brought federal civil rights claims, in which he asserted that the defendants retaliated against him because he aided a Black person and because he exercised his right to free speech. He also brought pendent claims under California law, in which he charged the defendants with intentional and negligent infliction of emotional distress, violation of the public policy favoring "whistleblowers", and other violations of state law.

The case went to trial before a jury in March of 1993. The court gave the jury a special verdict form, which restructured and pared down Maynard's claims. The jury answered only some of the questions on the form and left the others blank. The jury (1) did not return a verdict on the issue of whether the City was liable under Title VII for retaliating against Maynard because he assisted a Black person; (2) returned a verdict against Daniels and Atkinson for depriving Maynard of his civil rights under color of state law, 42 U.S.C. § 1983, but did not return verdicts as to White and Jackson on this claim;[1] (3) returned a verdict against Atkinson and Jackson for conspiring to deprive Maynard of his civil rights, 42 U.S.C. § 1985;[2] (4) returned a verdict against Jackson for intentional infliction of emotional distress, returned no verdict as to the three other individual defendants, and found the City not liable; (5) returned a verdict against the City and all four individual defendants for negligent infliction of emotional distress; and (6) did not return a verdict on Maynard's state-law claim alleging that the City retaliated against him for testifying truthfully or disclosing possible abuses of governmental power. The jury assessed damages of $138,-

---

1. Section 1983 provides in pertinent part:
    Every person who, under color of [law] ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

2. Section 1985(3) provides in pertinent part:

If two or more persons ... conspire ... for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws ... the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

000 against the City, $138,000 against White, $276,000 against Daniels, $414,000 against Atkinson, and $414,000 against Jackson.

After hearing post-trial motions, the district court denied the defendants' motions for judgment as a matter of law or a new trial. The court entered judgment against Maynard on the claims for which the jury had not returned verdicts, denied Maynard's requests to remove a performance evaluation from his personnel record and for reinstatement or frontpay, and awarded Maynard $67,500 in attorneys' fees. The City and the individual defendants appeal, and Maynard cross-appeals.

## II. *Settlement Agreement*

The parties participated in settlement conferences with a federal magistrate judge. At the conclusion of a conference on March 4, 1992, the parties agreed to the following terms and conditions for settlement of Maynard's lawsuit:

1) the defendants would pay $2,500 to Maynard;

2) the City would take corrective action with respect to one of Maynard's performance evaluations;

3) the City Manager would provide Maynard with a letter containing his personal assurances that Maynard's employment performance would be evaluated objectively and without regard to the litigation he had filed against the City.

The magistrate reported the case settled. The district court, however, concluded that the parties had never completed a final settlement agreement because they never had agreed to the content and form of the personal assurances the City Manager would include in his letter.

On appeal, the defendants raise two claims. They argue that the district court erred in not holding an evidentiary hearing. They further contend that the district court erred in concluding the parties had not finalized an agreement.

We review a district court's decision regarding the enforceability of a settlement agreement for an abuse of discretion. *Callie v. Near*, 829 F.2d 888, 890 (9th Cir.

1987). Reversal is appropriate only if the court based its decision "on an error of law or clearly erroneous findings of fact." *United States v. Oregon*, 913 F.2d 576, 580 (9th Cir.1990), *cert. denied*, 501 U.S. 1250, 111 S.Ct. 2889, 115 L.Ed.2d 1054 (1991).

By failing to request an evidentiary hearing in the district court, the defendants waived their right to raise the issue on appeal. In their motion to enforce the settlement agreement, they stated that they would support their argument with a memorandum, a declaration, records on file with the court, and "such argument as may be presented at the hearing on this Motion." When the court heard oral argument, the defendants never indicated that they wanted a full evidentiary hearing with an opportunity to cross-examine witnesses.

Further, the district court properly declined to enforce the agreement. "[T]he district court may enforce only *complete* settlement agreements." *Callie*, 829 F.2d at 890. After reviewing the correspondence between the parties and hearing from the attorneys involved in the settlement agreements, the court concluded that the parties never completed the settlement agreement. Although the attorneys left the March 4 settlement conference believing they would work out the final language of the City Manager's letter, they were not able to do so.

## III. *Evidentiary Rulings*

The defendants contend the district court erred in excluding evidence of Maynard's prior psychological conditions and treatments and evidence regarding Maynard's pending litigation with the County of Santa Cruz. We reject the argument.

We review the district court's evidentiary rulings for an abuse of discretion. Reversal is not appropriate unless the defendants establish that they suffered some prejudice. *Roberts v. College of Desert*, 870 F.2d 1411, 1418 (9th Cir.1988).

*A. Prior Conditions and Treatment.* Maynard alleged that his damages included emotional distress and severe depression. The symptoms he described included cold

sores and scaling of the scalp. The district court rejected the defendants' attempts to introduce evidence that Maynard had suffered from and received psychological treatment for similar job related conditions and symptoms when he was employed by the County of Santa Cruz in the early 1980's. The court reasoned that Maynard's prior psychological counseling, which occurred almost ten years before the trial, was too remote in time and involved different circumstances. In addition, the court wanted to avoid retrying Maynard's earlier lawsuit against the County of Santa Cruz.

Maynard waived any privilege protecting his psychological records when he put his emotional condition at issue during the trial. *Caesar v. Mountanos*, 542 F.2d 1064, 1067 (9th Cir.1976), *cert. denied*, 430 U.S. 954, 97 S.Ct. 1598, 51 L.Ed.2d 804 (1977). Nevertheless, the district court did not abuse its discretion in seeking to avoid a minitrial on the issues covered in Maynard's earlier lawsuit. The defendants argue that the jury should have been able to consider whether there were other causes of Maynard's emotional distress. The defendants also note that Maynard received psychological counseling in Santa Cruz soon before starting work in San Jose. However, the court's ruling did not prevent the defendants from having their own psychological experts examine Maynard pursuant to Fed.R.Civ.Pro. 35(a). *Schlagenhauf v. Holder*, 379 U.S. 104, 119, 85 S.Ct. 234, 243, 13 L.Ed.2d 152 (1964). The court also allowed defense counsel to question Maynard briefly about his prior conditions and symptoms.

*B. Pending Litigation with the County of Santa Cruz.* Maynard claimed that Jackson had spread false rumors that Nancy Carr–Gordon, who had worked with Maynard in Santa Cruz, had told her that Maynard was violent and that armed guards had escorted him out of the building on his last day of work in Santa Cruz. At trial, Maynard called Carr–Gordon as a witness. Contradicting Jackson's testimony, Carr–Gordon denied ever making these statements to Jackson. The district court rejected defense counsel's efforts to impeach Carr–Gordon by questioning her about a pending lawsuit in which Maynard was suing her for making defamatory statements about him to Jackson.

Defendants have not shown that they were prejudiced by the exclusion of evidence regarding Maynard's lawsuit against the County of Santa Cruz and Carr–Gordon. The court dismissed Maynard's defamation cause of action against Jackson. The court allowed Maynard to refer to the incident insofar as it related to his other claims, but in closing argument, the court also allowed defense counsel to impeach Carr–Gordon's testimony by arguing that her fear of a potential defamation suit gave Carr–Gordon a motivation to lie on the witness stand.

### IV. Verdicts on the Federal Civil Rights Claims

Daniels and Atkinson contend that they were entitled to judgment as a matter of law on Maynard's Section 1983 claim for deprivation of his rights under color of law. Atkinson and Jackson contend they were entitled to judgment as a matter of law on Maynard's Section 1985 claim for conspiracy to deprive him of equal protection of the laws. Daniels, Atkinson, and Jackson appeal the district court's denial of their post-trial motion.

We must decide three issues. Does Maynard, who is white, have standing under either Section 1983 or Section 1985 to complain that he suffered from illegal retaliation because he assisted a Black person? Did the district court properly instruct the jury regarding Maynard's burden of proving intentional discrimination? And were the verdicts on these claims supported by sufficient evidence of intentional discrimination?

*A. Standing.* Whether a plaintiff has standing is a question of law reviewed de novo. *Ellis v. City of La Mesa*, 990 F.2d 1518, 1523 (9th Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 2707, 129 L.Ed.2d 834 (1994).

A white plaintiff generally does not have standing under Section 1983 solely for the purpose of vindicating the rights of minorities who have suffered from racial discrimination. In *Halet v. Wend Inv. Co.*, 672 F.2d 1305, 1307 n. 1 (9th Cir.1982), the plain-

tiff, who was white, alleged that an apartment complex's adults-only rental policy was racially discriminatory because it had a greater effect on minorities. We held that he lacked standing under Section 1983 to assert the rights and interests of third parties. *Id.* at 1308–09.[3]

At the same time, we cited *Sullivan v. Little Hunting Park, Inc.*, 396 U.S. 229, 237, 90 S.Ct. 400, 404, 24 L.Ed.2d 386 (1969) for the proposition that in certain circumstances white plaintiffs may bring claims stemming from discrimination suffered by minorities. *Halet*, 672 F.2d at 1308. In *Sullivan*, a neighborhood cooperation expelled a white property owner who had attempted to lease his home to a Black man. The Supreme Court held that the white owner had standing to sue under 42 U.S.C. § 1982, and observed that at times a white plaintiff is "the only effective adversary." 396 U.S. at 237, 90 S.Ct. at 404. The Court emphasized that allowing the punishment to stand against the white owner would perpetuate the harmful effects of the restrictive covenant. *Id.*

■ Maynard has standing under Section 1983. Unlike the plaintiff in *Halet*, Maynard is not suing on behalf of anyone else. He asserts his own right to be free from retaliation, alleges injuries that are personal to him, and is the only effective plaintiff who can bring this suit. *Cf. Clemes v. Del Norte Cty. Unif. Sch. Dist.*, 843 F.Supp. 583, 591–92 (N.D.Cal.1994) (Section 1981 and 1982 claims). At least three other circuits have held that white plaintiffs have standing under 42 U.S.C. § 1981 when employers retaliate against them for aiding or interacting with minorities. *Skinner v. Total Petroleum, Inc.*, 859 F.2d 1439, 1446–47 (10th Cir.1988) (white employee fired for helping Black employee file an EEOC claim); *Winston v. Lear–Siegler, Inc.*, 558 F.2d 1266, 1268 (6th Cir.1977) (white employee alleged he was fired for protesting the perceived discriminatory termination of a Black employee); *De-Matteis v. Eastman Kodak Co.*, 511 F.2d 306, 312 (2d Cir.1975) (white employee alleged

that his employer fired him for selling his house to a Black employee).

■ Maynard also has standing under Section 1985. Plaintiffs have standing under Section 1985 only if they can show they are members of a class that the government has determined "require[s] and warrant[s] special federal assistance in protecting their civil rights." *Sever v. Alaska Pulp Corp.*, 978 F.2d 1529, 1536–37 (9th Cir.1992) (internal quotations omitted); *McCalden v. California Library Ass'n*, 955 F.2d 1214, 1223 (9th Cir. 1990), *cert. denied,* —— U.S. ——, 112 S.Ct. 2306, 119 L.Ed.2d 227 (1992). Section 706 of Title VII, 42 U.S.C. § 2000e–5, grants special protection to whites who are denied association with members of other groups because of an employer's discriminatory practices. *Patee v. Pacific Northwest Bell Telephone Co.*, 803 F.2d 476, 478–79 (9th Cir.1986); *Waters v. Heublein, Inc.* 547 F.2d 466, 469–70 (9th Cir.1976), *cert. denied,* 433 U.S. 915, 97 S.Ct. 2988, 53 L.Ed.2d 1100 (1977). Section 704(a) of Title VII, 42 U.S.C. § 2000e–3(a), grants special protection to all employees—regardless of race—who are subjected to retaliation for assisting in the investigation of discriminatory employment practices. *Eichman v. Indiana State University Bd. of Trustees*, 597 F.2d 1104, 1107 (7th Cir.1979). Thus, assuming Maynard's allegations are true, he is a member of a class that has standing to bring a Section 1985 claim.[4]

In a recent case in the Northern District of California, a white, male teacher alleged he had suffered retaliation for acting to protect the rights of Native American and female students. *Clemes*, 843 F.Supp. at 585–87. The district court determined that the plaintiff had standing under Titles VI and IX, *id.* at 588–90, but did not have standing under Section 1985 because he was not a member of a protected class. *Id.* at 592 (citing *Canlis v. San Joaquin Sheriff's Posse Comitatus*, 641 F.2d 711, 721 (9th Cir.), *cert. denied,* 454 U.S. 967, 102 S.Ct. 510, 70 L.Ed.2d 383 (1981)). Insofar as the decision in *Clemes* suggests that Maynard would not have standing unless he were Black, we decline to follow either the

---

**3.** However, we held that the plaintiff in *Halet* did have standing under the Fair Housing Act. *Id.* at 1309.

**4.** We note that in *Great American Federal S. & L. Ass'n. v. Novotny*, 442 U.S. 366, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979), the Supreme Court held that

Section 1985 may not be invoked to redress a violation of Title VII. In his Section 1985 claim, Maynard alleges the defendants violated his civil rights, not Title VII. We look to Title VII, however, to determine if Maynard is a member of a protected class.

court's reasoning or its interpretation of our Section 1985 precedents.

**B. Jury Instruction.** Maynard bore the burden of proving intentional discrimination. *Washington v. Davis*, 426 U.S. 229, 238–42, 96 S.Ct. 2040, 2046–49, 48 L.Ed.2d 597 (1976). "Whether a jury instruction misstates the elements that must be proved at trial is a question of law that is reviewed de novo." *Caballero v. Concord*, 956 F.2d 204, 206 (9th Cir.1992).

The instructions and special verdict regarding Maynard's Sections 1983 and 1985 claims referred exclusively to equal protection rights, and never mentioned free speech rights. Maynard did not object to these instructions. Although the Section 1983 cause of action in his complaint included First Amendment claims, he has waived these claims by failing to object to their exclusion from the instructions.

When instructing the jury on Maynard's Section 1983 claim, the district court quoted the Fourteenth Amendment and explained that the right to equal protection of the laws includes "the right not [to] be subjected to retaliation, adverse employment action, and emotional distress because [a] person offers assistance to a [B]lack person." The court then described Maynard's burden to prove "[t]hat the Defendants performed acts which operated to deprive the Plaintiff of one or more of his federal Constitutional rights, as defined and explained in these instructions, by retaliating against him or taking adverse employment actions against him."

The district court correctly explained the law. Intentional discrimination means that a defendant acted at least in part *because of* a plaintiff's protected status. *Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256, 279, 99 S.Ct. 2282, 2296, 60 L.Ed.2d 870 (1979). The court instructed the jury that in order to find an equal protection violation, they needed to find that the individual defendants retaliated against Maynard *because* he offered assistance to a Black person. Although the burden of proof instruction did not specifically mention intentional discrimination, the court

referred the jury to the immediately preceding definition of the civil rights claim at issue, which included the "because of" language. This reference adequately apprised the jury of the need to find intentional discrimination.

The district court properly instructed the jury regarding the Section 1985 claim. The court instructed the jury as follows on the issue of discriminatory intent:

> [T]here must be some intentional racially discriminatory purpose behind the conspirators' action. In the context of this case, you must find that the conspiracy was aimed at retaliation against Plaintiff because of his report of what he considered to be improper personnel procedures in the processing of the application of a [B]lack person.

**C. Sufficiency of the Evidence.** A jury's verdict or a court's denial of a motion for judgment as a matter of law must be affirmed if there is substantial evidence to support the verdict. *Landes Constr. Co. v. Royal Bank of Canada*, 833 F.2d 1365, 1370–71 (9th Cir.1987). Substantial evidence is such relevant evidence as reasonable minds might accept as adequate to support a conclusion even if it is possible to draw two inconsistent conclusions from the evidence. *George v. City of Long Beach*, 973 F.2d 706, 709 (9th Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1269, 122 L.Ed.2d 664 (1993).

Atkinson and Jackson preserved their right to challenge the sufficiency of the evidence on appeal by moving for a directed verdict in the district court. *United States v. 33.5 Acres of Land*, 789 F.2d 1396, 1400 (9th Cir.1986). As a matter of expediency, the district court agreed to let the defendants' trial brief serve as a motion for a directed verdict. Maynard did not object to the court's decision.

In Maynard's response brief, he argues that there was sufficient evidence to support a finding that Atkinson and Jackson conspired to violate his First Amendment rights. However, that question was not before the jury. The instructions and special verdict form framed Maynard's federal civil rights claims exclusively in terms of the Fourteenth

Amendment's prohibition of racial discrimination.

■ The dearth of evidence suggesting any racial animus on the part of Daniels, Atkinson, or Jackson persuades us that the jury's verdicts on the Sections 1983 and 1985 claims cannot stand. We recognize that defendants typically do not announce their discriminatory intentions. Appellate courts reviewing the sufficiency of the evidence must be alert to the often subtle ways in which a record may reflect defendants' hidden discriminatory purposes. Nonetheless, while there is evidence that Daniels, Atkinson, and Jackson retaliated against Maynard, there is an absence of evidence that this retaliation occurred because Maynard assisted a Black person. The record reflects instead that they were angry and embarrassed that Maynard had publicly exposed the post-dated letter. *Cf. Coverdell v. Department of Social & Health Serv's.*, 834 F.2d 758, 769 (9th Cir.1987).

Maynard testified that at one time Jackson told him she did not believe in giving minorities preferential treatment. Standing alone, this cannot establish a racial animus. Maynard claims that Jackson told him "nigger" was a grammatically correct term. But the record establishes that while explaining to Maynard why she found sexist language offensive, Jackson told him that although "nigger" might once have been an acceptable term, it no longer was. When Maynard brought the post-dated letter to the Department's attention, he framed his complaint in terms of Atkinson's and Jackson's violation of the Department's hiring practices, not in terms of racial discrimination against Adkins. In depositions and trial testimony, Maynard expressed doubts that Daniels, Atkinson, and Jackson acted with a racially discriminatory purpose. In the briefs Maynard submitted to this court, he abandoned any argument based on intentional racial discrimination and relied solely on arguments based on the First Amendment.

The evidence suggesting an alternative motive for the defendants' actions further influences our decision. Maynard testified that Daniels had formally reprimanded him for disclosing the hiring irregularities outside the "chain of command." Maynard further alleged that Atkinson had told him that he lost all credibility when he "leaked" the information about the letter of hire. We do not suggest that the statements Maynard attributes to the defendants were proper or justified. We note only that the evidence presented by Maynard indicates the defendants' hostility towards him was not kindled by racial prejudice.

We reverse the jury's verdicts for Maynard on his Sections 1983 and 1985 claims. Having done so, we need not address the defendants' argument that they were entitled to qualified immunity on Maynard's federal claims.

## V. State Claims for Intentional and Negligent Infliction of Emotional Distress

■ *A. Preemption.* The defendants argue that Maynard's state claims for intentional and negligent infliction of emotional distress are preempted by California's Workers' Compensation Act. Preemption is a question of law reviewed de novo. *Holman v. Laulo–Rowe Agency*, 994 F.2d 666, 668 (9th Cir.1993).

■ The Workers' Compensation Act does not preempt Maynard's claims. Personal injury claims that implicate fundamental public policy considerations are not preempted by the Workers' Compensation Act. *Gantt v. Sentry Ins.*, 1 Cal.4th 1083, 4 Cal.Rptr.2d 874, 875–76, 886, 824 P.2d 680, 681–82, 692 (1992). *Gantt* involved a wrongful discharge action, and the California supreme court carefully avoided setting the exact parameters of the public policy exception as to all types of claims. *Id.* at 881–82, 824 P.2d at 687–88. Yet the court did hold that a public policy is fundamental if it has a basis in constitutional or statutory provisions. *Id.*

In contrast to Maynard's federal civil rights claims, the district court submitted to the jury Maynard's state law claims for intentional and negligent infliction of emotional distress claims based on alleged retaliation for Maynard's assistance of a Black person and for his reporting of perceived irregularities in the purchase of communications equip-

ment. Maynard's claims arise out of conduct that implicates fundamental public policies, as manifested by Cal.Gov.Code § 12940(f) (prohibiting retaliation against employees who oppose or participate in the investigation of discriminatory practices) and Cal. Labor Code § 1102.5 (prohibiting retaliation against employees who disclose to the government violations of state or federal statutes and regulations).

**B. Statute of Limitations.** Pursuant to the California Tort Claims Act, a plaintiff suing a city and its employees must present a claim to the city no more than six months after accrual of the cause of action. Cal.Gov.Code § 911.2 (1994). In addition, claims of infliction of emotional distress must be filed in a court within one year. *Cantu v. Resolution Trust Corp.,* 4 Cal.App.4th 857, 889, 6 Cal.Rptr.2d 151 (1992); Cal.Code of Civ.Pro. § 340 (1994). The district court did not make factual findings. We independently review the record. *United States use of Wiltec Guam, Inc. v. Kahaluu Constr. Co.,* 857 F.2d 600, 603 (9th Cir.1988).

In May of 1989, Maynard filed a claim with the City, which it rejected the following month. He filed his complaint in federal court on November 17, 1989. Maynard alleged an ongoing campaign of retaliation that lasted at least through April 1989, when he was transferred to the Airport Department. He filed his claim and lawsuit within the periods specified by California law.

**C. Jury Instruction on Fair Comment.** Jackson argues that the trial court erred in declining to instruct on the defense of fair comment as it applied to her statements. We review de novo whether the defense of fair comment applies. *Caballero v. Concord,* 956 F.2d 204, 206 (9th Cir.1992); *Institute of Athletic Motivation v. University of Illinois,* 114 Cal.App.3d 1, 13 n. 5, 170 Cal.Rptr. 411 (1980).

Under California law, a statement is privileged if it involves

a communication, *without malice,* to a person interested therein, (1) by one who is also interested, or (2) by one who stands in such a relation to the person interested as to afford a reasonable ground for suppos-

ing the motive for the communication innocent, or (3) who is requested by the person interested to give the information.

Cal. Civil Code § 47, subdiv. (c) (1994) (emphasis added). The jury found that Jackson acted with malice. Therefore, the defense of fair comment could not have applied to her statements. *Deaile v. General Tel. Co.,* 40 Cal.App.3d 841, 847–48, 115 Cal.Rptr. 582 (1974).

## VI. Damages Award, Equitable Relief, and Attorneys' Fees

The special verdict form did not apportion the damages between the verdicts we have reversed and the ones we have affirmed. We vacate the damages award and remand. *Memphis Comm. Sch. Dist. v. Stachura,* 477 U.S. 299, 312–13, 106 S.Ct. 2537, 2545–46, 91 L.Ed.2d 249 (1986); *Smiddy v. Varney,* 665 F.2d 261, 268 (9th Cir.1981), *cert. denied,* 459 U.S. 829, 103 S.Ct. 65, 74 L.Ed.2d 66 (1982).

In his cross appeal, Maynard argues that the district court erred in (1) denying his request for reinstatement or frontpay and the removal of an unfavorable performance evaluation, and (2) granting him only $67,500 of the $135,075.50 in attorneys' fees he requested pursuant to 42 U.S.C. § 1988. As Maynard has not prevailed on his federal civil rights claims, he is not entitled to either equitable relief or attorneys' fees. We affirm the denial of equitable relief and vacate the attorneys' fee award.

On appeal, each side shall bear their own fees and costs.

## VII. Conclusion

We REVERSE the Section 1983 verdict against Daniels and Atkinson and the Section 1985 verdict against Atkinson and Jackson, VACATE the damages and attorneys' fees awards, AFFIRM the remaining verdicts and rulings, and REMAND for determination of damages, if any, related to retaliation in absence of racial bias.